REQUESTED BY: Harold W. Clarke, Director, Nebraska Department of Correctional Services
You have asked several questions regarding the administration of LB 278 passed during the 1997 Legislative Session which is known as the DNA Detection of Sexual and Violent Perpetrators Act (Act). The Act requires that a person who is convicted of a felony sex offense or other specified offense have a blood or tissue sample drawn for DNA identification purposes. It also establishes a state DNA data base for DNA records and a state DNA sample bank as a repository for DNA samples.
Your first questions is where the sample is to be collected. The Act requires that if a person is already confined when convicted, the sample is to be drawn immediately after sentencing. Your inquiry is whether the Department of Correctional Services is required to draw the samples or should the Act be interpreted to mean that the samples should be drawn in county jails where most inmates are incarcerated when they are convicted and sentenced to prison. LB 278 provides at § 6:
 (1) A person who is convicted of a felony sex offense or other specified offense on or after the effective date of this Act shall have a DNA sample drawn: (a) upon intake to a prison, jail, or other detention facility or institution to which such person is sentenced. If the person is already confined at the time of sentencing, the person shall have a DNA sample drawn immediately after the sentencing. Such DNA samples shall be drawn at the place of incarceration or confinement. Such persons shall not be released unless and until a DNA sample has been drawn; . . .
The general rules governing statutory construction and interpretation provide that in the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning. Proctor v. Minnesota Mutual Fire Casualty,248 Neb. 289, 534 N.W.2d 326 (1995); George Rose Son Siding Grading Co. v. Nebraska Dept. of Revenue, 248 Neb. 92,532 N.W.2d 18 (1995). In this instance, the legislative bill provides that if the person is confined at the time of sentencing, the DNA sample is to be drawn immediately after sentencing at the place of incarceration or confinement. Those individuals not confined at the time of sentencing are to have a DNA sample drawn upon intake to the prison, jail, or other detention facility or institution to which they have been sentenced. Therefore, it is our determination that if an individual is confined in a county jail or other detention facility at the time the sentence is imposed, that individual shall have a DNA sample drawn immediately after sentencing at that detention facility. Those individuals not confined at the time of sentencing shall have a DNA sample drawn upon intake to the prison, jail or other detention facility or institution to which they have been sentenced.
Your second question relates to the use of physical force to require an inmate to submit a DNA sample. You inquire whether the Department of Correctional Services or the county jail facility may involuntarily take a specimen from an inmate using physical force. It is our determination that the legislature has not authorized the use of physical force in obtaining these DNA samples.
LB 278 simply states that offenders convicted of the listed crimes "shall" have DNA samples drawn, and "shall not be released unless and until a DNA sample has been drawn." There is no specific provision illustrating how this is to be accomplished.
The legislative history of the bill addresses the question of use of force even more directly. The statute was patterned after the Pennsylvania statute 35 PS § 7651 (LB 278, Judiciary Committee hearing, February 7, 1997, p. 114) which includes a specific provision allowing the use of physical force. As originally introduced in committee, LB 278 included a similar provision permitting the use of reasonable force by law enforcement and corrections personnel to obtain the DNA samples. This section was removed after public hearing by the judiciary committee. Senator Brashear summarized the committee amendments, including the striking of the provision allowing physical force:
 And finally, the committee amendments remove a section that permitted law enforcement and corrections personnel to use reasonable force when drawing DNA samples from the subject, so that the permission to use reasonable force no longer exists. If the subject refuses and will not permit, then the corrections and law enforcement personnel will have to proceed otherwise.
LB 278, Floor Debate, April 2, 1997, p. 3113.
It is our determination that LB 278 does not authorize the use of physical force to obtain DNA samples. Not only do the words of the Act not authorize the use of physical force, but the legislative history reinforces the intent of the legislature not to authorize physical force in obtaining the DNA samples.
Your next question relates to the meaning of "maximum term" in § 6 of the Act. Section 6(1)(a) provides that a person convicted of a felony sex act or other specified offense on or after the effective date of the Act shall have a DNA sample drawn: upon intake to a prison jail or other detention facility. "Such person shall not be released until or unless a DNA sample has been drawn." Paragraph (6)(2) of § 6(2) of the Act provides:
 A person who has been convicted of a specified offense before the effective date of this Act and who is still serving a term of confinement for such offense on the effective date of this Act shall not be released prior to the expiration of his or her maximum term of confinement unless and until a DNA sample has been drawn.
Your question specifically goes to whether an inmate who refuses to give a specimen must serve his maximum term less his good time without parole, or must serve his maximum sentence without any good time awarded and without parole. You further ask what should be done with inmates who have a "flat" sentence, e.g. where the minimum and maximum terms are the same.
There is no definition of "maximum term" within LB 278. However, Neb. Rev. Stat. § 83-170 (1994) defines several terms related to correctional services. Subsection 8 defines maximum term "to mean the maximum sentence provided by law or the maximum sentence imposed by a court, whichever is shorter."
In determining the meaning of the statute, the applicable rule is when the legislature enacts a law affecting an area which is already the subject of other statutes, it is presumed that it did so with full knowledge of the preexisting legislation and decisions of the Supreme Court construing and applying that legislation. White v. State, 248 Neb. 977, 540 N.W.2d 354 (1995);see also Dalition v. Langemeier, 246 Neb. 993, 524 N.W.2d 336
(1994); In re Hilbers Property Freehold Transfer, 211 Neb. 268,318 N.W.2d 265 (1982). It must be presumed that the legislature was already aware of the definition that they had given to maximum term in those statutes relating to the Department of Correctional Services. If the legislature had intended that an inmate have the advantage of good time statutes even though a DNA sample had not been provided, it is presumed that they would have defined the maximum term specifically for the Act or indicated that the inmate was to serve the maximum sentence less good time received. Therefore, the definition of maximum term provided by the legislature in those statutes relating to the Department of Correctional Services, specifically, Neb. Rev. Stat. § 83-270(8) must be applied to the definition of maximum term as it occurs in LB 278. Thus, an inmate who refuses to give the required DNA sample must serve his or her maximum sentence as imposed by the court or the maximum sentence allowed by law, whichever is shorter, without any good time and without any parole. An inmate to whom the Act applies who has a "flat" sentence (one where the maximum and minimum terms are equal) would also be required to serve the maximum sentence as defined by statute unless a DNA sample is provided.
Your fourth and fifth questions deal with the issue of whether an inmate convicted of an applicable crime who has not supplied a DNA sample may be released on travel orders, furloughs, work detail, or any other work activity outside the perimeter of a secure institution, or be placed on minimum custody status to work outside the perimeter of a secure institution under intermittent supervision of staff members.
The statutes specifically state that a person who is convicted of one of the specified offenses on or after the effective date of the Act "shall not be released unless and until a DNA sample has been drawn," and one who has been convicted of a specified offense "before the effective date of this Act and who is still serving a term of confinement for such offense on the effective date of this Act shall not be released prior to the expiration of his or her maximum term of confinement unless or until a DNA sample has been drawn." LB 278, § 3(9) defines "release" as "any release, parole, furlough, work release, prerelease, or release in any other manner from a prison, jail or any other detention facility or institution." Therefore, an inmate who refuses to submit a DNA specimen may not be released for any of the programs you ask about or any similar program.
You have also asked whether a court order for transportation of an inmate to a court proceeding would qualify as a release for the purposes of the statute. The court order distinguishes the situation. The Act does not include transportation of inmates to court proceedings within the definition of "release" nor is this activity analogous to any of the listed examples included within the definition. Unlike parole, furlough, work release or prerelease, transportation of an inmate to court proceedings in compliance with a court order is more in the nature of a mandatory rather than a discretionary "release." Therefore, because a transfer to court as a result of a court order is the compliance with the mandatory directive of the court and is not a "release" within the statutory definition, the court order should be honored regardless of whether the DNA specimen has been obtained.
 DON STENBERG Attorney General
 Linda L. Willard Assistant Attorney General
Approved By:
Don Stenberg
Attorney General